

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

vs.

ALEXANDER HAMILTON EDWARDS, III,

    Defendant.

Case No. 8:03-CV-1647-T-26MAI

COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## NATURE OF THE ACTION

1. Alexander H. Edwards, III ("Edwards"), the former president of SRI/Surgical Express, Inc. (SRI), a hospital supply company, caused SRI to enter into two transactions that resulted in SRI overstating its Fiscal 2001 third quarter revenue by $832,000. Edwards caused SRI to report these transactions as sales in its financial statements even though neither of the counter parties ever agreed to accept delivery of, or pay for, additional

products in SRI's third quarter. As SRI's president and sales director, Edwards was reckless in not knowing that these transactions were not sales.

2. On November 27, 2001, SRI restated its third quarter Form 10-Q to reverse the improperly recognized sales and the prematurely recognized customer orders in the third quarter.

## JURISDICTION

3. The SEC brings this action pursuant to the authority conferred on it under Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin defendant from engaging in the acts, practices and courses of business alleged herein, and to obtain a civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa].

4. Defendant, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein. Therefore, the SEC seeks a judgment permanently enjoining Defendant from future violations.

## DEFENDANT

5. Alexander H. Edwards, III ("Edwards"), 37, served as president of SRI from May 2001 until he resigned in April 2002. Edwards joined SRI in 1997. Prior to becoming president, where he was primarily responsible for SRI's sales force, Edwards served in various positions including senior vice president of sales and marketing. Edwards resides in Tampa, Florida.

## RELEVANT PERSONS

6. SRI/Surgical Express, Inc. ("SRI") is a Florida corporation headquartered in Tampa, Florida. SRI's common stock is registered with the Commission pursuant to 12(g) of the Exchange Act and is traded on the NASDAQ National Market System under the symbol "STRC." The company operates a fifty-two to fifty-three week fiscal year ending the Sunday nearest December 31. For its 2001 fiscal year, SRI reported total revenues of $86,426,000 and net income of $5,057,000. SRI has consented to the entry of an order that it cease and desist from committing any violations and any future violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 13a-13 and 12b-20 thereunder (the "Settled Order").

7. Wayne R. Peterson, 51, ("Peterson"), was SRI's Chief Operating Officer (COO) until he resigned in December 2002. Peterson also

consented to the entry of the Settled Order that he cease and desist from causing any violations and any future violations of Sections 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder.

8. James T. Boosales, 59, ("Boosales") served as SRI's chief Financial Officer (CFO) from its inception until December 2002. Boosales consented to the entry of the Settled Order that he cease and desist from committing or causing any violations and any future violations of Section 13(b)(2)(B) of the Exchange Act.

## CONDUCT RELEVANT TO ALL CLAIMS

### Background

9. SRI/Surgical Express, Inc. provides hospitals and surgery centers with a daily delivery and retrieval service that furnishes both reusable and disposable products used in various surgical procedures. In 2001, SRI served hospitals and surgery centers from twenty-seven reprocessing and distribution centers (the "facilities") located in twenty-four states throughout the United States. The majority of SRI's customers placed daily orders through one of several regional facilities. The company's drivers then delivered the products directly to the customer's surgery area by the following morning. If a customer failed to place an order, SRI delivered a pre-determined par value amount based on the customer's prior usage.

SRI's drivers and customer service representatives maintained the inventory for the remaining customers based on each hospital's surgery schedule.

10. SRI's revenue recognition policy—as disclosed in the company's Form 10-K—required products to actually be delivered to the customer before a sale could be recognized on SRI's books.

11. SRI's stock price steadily climbed from $13 per share in January to $30 per share in mid-June 2001.

12. However, by mid-June, just weeks before the June 30, 2001 close of the second quarter, management learned that SRI was likely to miss its quarterly earnings target. This projected revenue fall-off was mainly attributed to two factors. First, sales from the company's existing customer base were down. SRI lost more accounts during the summer of 2001 than it had in the company's history. Second, SRI's sales force failed to realize anticipated new business.

13. As explained in the Settled Order, based on conduct of others, SRI prematurely booked certain customer sales orders in its second quarter ended June 30, 2001. These prematurely recognized customer orders allowed SRI to meet its analyst expectations at the end of the second quarter.

14. In September 2001, the last month of SRI's fiscal third quarter, SRI again remained well short of its revenue targets. With just five days remaining in the third quarter, SRI had a $2 million shortfall from its revenue goal.

15. In connection with efforts to address the third quarter revenue deterioration, SRI's then CFO James Boosales asked Edwards to contact some of SRI's larger customers to see if they would be interested in purchasing additional product.

16. In response to Boosales' request, Edwards caused SRI to enter into two transactions that improperly boosted SRI's sales to meet SRI's revenue targets.

17. The first was with Jewish Hospital HealthCare System (JHHS), in Louisville, KY, which had a service contract with SRI pursuant to which SRI provided daily delivery and retrieval of a predetermined amount of surgical supply products and materials. One of the main reasons JHHS entered into the service contract was that SRI's daily delivery service allowed JHHS to avoid the carrying costs associated with maintaining large amounts of inventory on its books. Another was that JHHS did not have the physical capacity to store such inventory.

18. On or about September 11, 2001, a few weeks prior to the September 30, 2001 close of SRI's third quarter, Edwards contacted a JHHS vice-president. Edwards explained that SRI was having trouble balancing inventory among its various facilities, and that he was going to send some inventory to the depot SRI used to supply JHHS. Edwards did not specify how much inventory SRI would send. Edwards told the official that JHHS might receive some invoices, but that the hospital should ignore them. The vice president responded that JHHS would not pay for any products that JHHS did not consume, and that Edwards should contact the controller of JHHS's purchasing agent about anything relating to invoicing.

19. Later in September or in early October, Edwards then spoke with the purchasing agent's controller and told him that SRI was having an inventory problem. Edwards asked if SRI could pre-bill JHHS for sixty to ninety days of inventory. Edwards explained that he did not expect JHHS to pay SRI any of the invoices for goods billed and not delivered. Instead, and consistent with their contractual arrangement, Edwards acknowledged JHHS would only pay for the products it actually used. When the controller expressed concern about his ability to track the amount of inventory that JHHS actually consumed, Edwards responded that SRI would help him

determine what it had used. As a favor to Edwards, the purchasing agent's controller agreed to this arrangement.

20. As a result of these conversations, sometime after September 11, 2001, Edwards informed Boosales that JHHS was willing to take as much product as SRI had available.

21. In or about early October, Edwards sent the purchasing agent's controller invoices totaling $753,480 for the entire pre-billed inventory. Because the purchasing agent's controller knew that JHHS was only required to pay for product it actually used, he simply put the invoices in a drawer.

22. As a result, SRI improperly recorded $753,480 in sales revenue in its third quarter, even though JHHS had not agreed to take delivery of the additional product and SRI did not deliver $753,480 worth of additional supplies or products to JHHS in that quarter.

23. The second transaction was with UMass Memorial Medical Center (UMass) in Worcester, Massachusetts. Like JHHS, UMass paid SRI for products as SRI actually delivered them to the hospital. In the fall of 2001, UMass was experiencing financial difficulties, and it had no interest in paying SRI for supplies in excess of its daily needs.

24. Shortly before the September 30 close of SRI's third quarter, Edwards asked two UMass officials if they would accept early shipment of some inventory that SRI had customized for UMass. Edwards explained that he was interested in shipping an additional 30-day supply of inventory to SRI's Marlboro, Massachusetts facility in exchange for a discount in SRI's price. SRI used that facility as a depot for servicing UMass.

25. Because UMass was experiencing financial difficulty at the time, the idea of getting a discount without having to carry the additional inventory on its books, appealed to the UMass officials. As a result, they asked Edwards to put his proposal in writing.

26. Edwards never did provide any written documentation of his proposal to UMass. UMass never ordered any additional supplies or products under the arrangement Edwards proposed.

27. Edwards subsequently informed SRI's CFO Boosales that UMass agreed to purchase a thirty-day supply of inventory at a five percent discount. In addition, Edwards told Boosales that UMass was interested in a buffer stock because they were concerned with possible service disruptions in the winter.

28. SRI then selected the products it would earmark as falling within Edwards' oral arrangement. SRI's accounting group prepared

invoices based on its understanding of the transaction as relayed by Edwards. But in a departure from its standard practice, SRI's accounting group did not send these invoices to UMass. Instead, it gave them to Edwards who agreed to deliver them to the proper person at UMass.

29. Edwards received the invoices but never provided them to UMass. As a result, UMass never paid any of the invoices for the purported bulk sale, although it paid other SRI bills issued both before and after that time period.

30. SRI did not deliver additional supplies or products as discussed in Edwards' proposal to UMass in SRI's 2001 third quarter.

31. As a result of this purported transaction, SRI inappropriately recorded approximately $88,000 of sales revenue on its books and records.

32. As a result of the purported transactions with JHHS and UMass, SRI's third quarter 2001 revenues were overstated by $832,000, or 3.9 percent of total revenue. This overstatement allowed SRI to meet analysts' earnings per share targets, which ranged from $0.24 to $0.26. By virtue of these overstatements, SRI's third quarter Form 10-Q was materially false and misleading.

33. As explained in the Settled Order, based on conduct of others, SRI also prematurely recognized certain customer orders in its third quarter

ended September 30, 2001. These prematurely recognized orders contributed an additional $216,000 to SRI's third quarter revenue. Thus, the total revenue overstatements for the quarter equaled 4.9 percent.

### SRI's Restatement

34. On November 27, 2001, SRI restated its third quarter financial results. SRI reversed out the JHHS and UMass sales and corrected the prematurely recognized customer sales mentioned above thereby reducing its third quarter revenue by $1,034,000. SRI's restated its earnings per share mark to $0.22 per share—well short of analysts' expectations.

35. Edwards was reckless in not knowing that the additional deliveries were not made to JHHS and UMass, and by causing SRI to recognize revenue from the purported transactions.

### FIRST CLAIM FOR RELIEF

Violations of Section 10(b)
of the Exchange Act [15 U.S.C §78j(b)], and
Rule 10b-5 thereunder
[17 C.F.R. ¶ 240.10b-5]

36. Paragraphs 1 through 12, 14 through 32, 34 and 35 are realleged and incorporated by reference herein.

37. Section 10(b) of the Exchange Act [15 U.S.C §78j(b)], and Rule 10b-5 thereunder [17 C.F.R. ¶ 240.10b-5] prohibit persons from,

directly or indirectly, filing misleading financial statements with the Commission.

38.  SRI filed a fiscal 2001 third quarter Form 10-Q that reported revenue from the transactions with JHHS and UMass in its fiscal 2001 third quarter, when these transactions did not constitute final sales and therefore should not have been recorded in that quarter under GAAP and SRI's revenue recognition policy.

39.  Those accounting and disclosure violations were material, because: (1) they caused revenue to be substantially overstated; and (2) masked a failure by the company to meet analysts' expectations.

40.  As a consequence, Edwards recklessly caused SRI to file misleading financial statements in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. ¶ 240.10b-5] promulgated thereunder.

## SECOND CLAIM FOR RELIEF

Violations of Section 13(b)(5) [15 U.S.C. §78m(b)(5)] and Rule 13b2-1 [17 C.F.R. ¶¶ 240.13b2-1] of The Exchange Act

41.  Paragraphs 1 through 12, 14 through 32, 34 and 35 and incorporated by reference herein.

42.  Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(A) and 15 U.S.C. §78m(b)(2) (B)] require an issuer to

make and keep accurate books and records and maintain a system of internal accounting controls sufficient to provide reasonable assurances that its financial statements were prepared in accordance with generally accepted accounting principles.

43.   Section 13(b)(5) of the Exchange Act prohibits any person from knowingly falsifying any book, record or account.

44.   Rule 13b2-1 prohibits any person from falsifying any book or record subject to Sections 13(b)(2)(A).

45.   By describing the transactions with JHHS and UMass as third quarter sales, Edwards caused individuals in SRI's accounting department to create false entries in SRI's books and records. Also, Edwards also caused the creation of false records by causing SRI to generate inaccurate invoices. In doing so, Edwards violated Section 13(b)(5) [15 U.S.C. §78m(b)(5)] and Rule 13b2-1 [17 C.F.R. ¶¶ 240.13b2-1].

### THIRD CLAIM FOR RELIEF

Aiding and Abetting Violations of Section 13(b)(2)(A) and 13(B)(2)(B)
Of the Exchange Act [15 U.S.C 78m(b)(2)(A) and 15 U.S.C. 78m(B)(2)(B)]

46.   Paragraphs 1 through 12, 14 through 32, 34 and 35 are realleged and incorporated by reference herein.

47. Section 20(e) [15 U.S.C §78t(e)] of the Exchange Act prohibits any person from aiding and abetting another person to violate any provision of the Exchange Act or any rule or regulation issued thereunder.

48. Based on the facts described above Edwards aided and abetted SRI's violation of Sections 13(B)(2)(A) and 13(B)(2)(B) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court issue an Order:

### I.

Permanently enjoining defendant Edwards and his, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice by personal service or otherwise, from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rule 10b-5 thereunder [17 C.F.R. ¶ 240.10b-5].

### II.

Permanently enjoining defendant Edwards and his agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice by personal service or otherwise, from

violating, directly or indirectly, Section 13(b)(5) of the Exchange Act and Rule 13b2-1 promulgated under the Exchange Act [17 C.F.R. ¶ 240.13b2-1].

### III.

Permanently enjoining defendant Edwards and his agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice by personal service or otherwise, from violating, directly or indirectly, or aiding and abetting violations of, Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(A) and 15 U.S.C. §78m (b)(2)(B)].

**IV.**

Requiring Edwards to pay a civil penalty of $50,000 pursuant to Section 21(d)(3)(B)(ii) of the Exchange Act [15 U.S.C. §78u(d) (3)(B)(ii)] and 17 C.F.R. § 201.1002.

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Granting such other and additional relief as this Court may deem just and proper.

Dated: August 5, 2003     Respectfully submitted,

*N. Creola Harry*
Thomas C. Newkirk
Kenneth J. Guido*
Cheryl J. Scarboro
C. Joshua Felker
N. Creola Harry
U.S. Securities and Exchange Commission
450 Fifth Street, NW
Washington, DC 20549-0911 [Guido]
Phone:     (202)-942-7933 [Guido]
Fax:         (202) 942- 9581 [Guido]

* Plaintiff's Trial Attorney